# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO
### Honorable Howard R. Tallman

| | |
|---|---|
| **In re:** ) | |
| ) | |
| **JOHN T. FLANAGAN and** ) | **Case No. 12-24741 HRT** |
| **JANE M. FLANAGAN,** ) | **Chapter 7** |
| **Debtors.** ) | |
| ) | |
| ) | |
| **DAVID R. WHARTON,** ) | **Adversary No. 12-01652 HRT** |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **JOHN T. FLANAGAN,** ) | |
| ) | |
| **Defendant.** ) | |

## ORDER

THIS MATTER comes before the Court on the complaint filed by David R. Wharton ("Wharton") alleging claims under 11 U.S.C. § 523(a)(2)(A) against Debtor John T. Flanagan ("Flanagan"). A trial on the matter was held on March 24, 2014, at the conclusion of which the Court ordered the parties to submit written closing arguments, which were timely filed. After reviewing the entire record, the Court is now ready to rule.

I. Background

In 2004, Flanagan, who operated Red Robot (a marketing agency), and Wharton, who operated Inceptive Partners (an information technology and management company) began discussing a combination of their two businesses, and decided to merge Inceptive Partners into Red Robot. During this time there were discussions about Wharton's monthly salary and also whether Wharton would obtain an equity interest in Red Robot. In the summer of 2004, the parties issued a press release drafted by Flanagan announcing Red Robot's acquisition of Inceptive Partners and touting its expanded capabilities in branded entertainment[1] as a result of the acquisition.

---

[1] During his testimony, Wharton explained branded entertainment as "bringing a sponsor together with entertainment," and gave the example of the show "Amazing Race," which gives out Ford vehicles and Travelocity packages as prizes.

Wharton began working as Red Robot's Vice President and General Manager on May 1, 2004 at a monthly salary of $8,000. Flanagan, who served as the Chief Executive Officer of Red Robot, received a monthly salary of $9,000. Wharton was responsible for managing the operations of Red Robot, including maintaining its QuickBooks financial records, while Flanagan was responsible for client development.

No stock certificate was ever issued to Wharton, but Wharton testified that, due to the tax consequences of the transaction, he understood he and Flanagan would formalize the transfer of equity after one of the following two events: (1) Red Robot's receipt of additional funds from outside investors or (2) an acquisition of Red Robot. Flanagan testified that he never formally issued stock to Wharton because they never resolved the precise amount of equity to which Wharton was entitled. Flanagan did acknowledge under cross-examination that from time to time he told Wharton he was entitled to an equity interest of approximately 10%.

From the time Wharton began working for Red Robot, the company faced cash flow problems. Wharton made loans to Red Robot and on numerous occasions deferred his compensation so that Red Robot could meet its obligations, including paying its other employees. Wharton alleges that from the time he began working at Red Robot through his departure on July 31, 2006, he earned $96,000 in deferred compensation. In addition to the deferred compensation, Wharton also made a number of loans to Red Robot throughout his employment.

In early 2006, upon Wharton's recommendation, Red Robot furloughed all of its employees other than Wharton and Flanagan, who both agreed to continue deferring their compensation until the financial situation improved. Flanagan also began having talks with a new client, Tom Zelenovic, about a potential, significant investment in Red Robot. Wharton assumed that Flanagan was representing Red Robot's and Wharton's interests in the negotiations, and believed that the Zelenovic transaction would increase the value of his ownership interest. In July 2006, however, Wharton came across a fax of a term sheet for the proposed transaction sent by Zelenovic to Flanagan. The term sheet provided that Flanagan's deferred compensation would be repaid out of the investment proceeds but made no reference to the amounts owed to Wharton. Wharton also learned that Flanagan and Zelenovic had agreed that Red Robot would no longer employ W-2 employees but rather would only use "1099 consultants" (independent contractors).

Wharton then consulted friends and advisors and decided that his priority was to get repaid for amounts owed to him by Flanagan and Red Robot, even if that meant walking away from his now valuable equity interest in the company. Wharton met with Flanagan on July 25, 2006 at Red Robot's office. Wharton testified that at that meeting, Flanagan promised to repay Wharton for: (1) $96,000 in deferred compensation; (2) loans Wharton had made to the company (approximately $11,000, not counting a $6,000 outstanding credit card bill); and (3) a personal loan that Wharton made to Flanagan the same day to cover the premium for Flanagan's

family health insurance.[2] Flanagan told Wharton he would repay these amounts out of the proceeds he expected to receive shortly from Zelenovic. In exchange, Wharton agreed he would walk away from Red Robot and allow the Zelenovic deal to go forward without him. Specifically, Wharton agreed to relinquish his claim to an equity interest and also resign as an employee. Wharton resigned as an employee effective July 31, 2006.

On September 6, 2006, Flanagan executed a note for the Zelenovic transaction, under which Red Robot received a total of $500,000. The note expressly provided for paying deferred compensation to Flanagan, but not to Wharton. Between September and December 2006, Flanagan paid himself more than $60,000 from the Zelenovic funds. Neither Red Robot nor Flanagan has paid any amount toward the $500,000 borrowed from Zelenovic. At trial, Flanagan admitted he never told Wharton that Red Robot had received the funds from the Zelenovic transaction.

On October 1, 2006, Red Robot issued a check to Wharton for $10,000 with a note in the memo line that stated "Loan repayment." (Ex. 56). On October 11, 2006, Wharton asked when he would be paid the "balance of the money due me" and asserted that he was owed either $106,000 if paid as an employee, or $113,000 if paid as an independent contractor (Ex. 60). On October 12, 2006, Flanagan asserted that he disputed the amount of deferred compensation owed to Wharton, but acknowledged that Wharton was still owed for loans paid to the company. (Ex. 61). Thereafter the parties began discussing litigation to determine the amount owed to Wharton. In January 2007, Flanagan told Wharton he was "still trying to keep the company afloat" and that "if we can use your services I will get you some income." (Ex. 63). Red Robot's balance sheet as of December 31, 2006, showed that Red Robot owed Wharton $96,000 in deferred compensation. (Ex. 79). However, Red Robot's balance sheets prepared for the period of January through May 2007 demonstrate that Flanagan simply deleted that liability from Red Robot's books. (Ex. 83).

Wharton filed a lawsuit against Flanagan in state court on July 23, 2009, asserting claims for breach of contract and fraud. The parties participated in discovery, and in January 2010, Flanagan's depositon was taken. Shortly thereafter, Flanagan's counsel withdrew, and Flanagan failed to appear for a subsequent status conference. Wharton filed a motion for default judgment, to which Flanagan did not respond. The state court entered a default judgment against both Flanagan and Red Robot on May 13, 2010. In that order, the state court found that Flanagan "fraudulently promised to pay, and did not pay, [Wharton] for certain compensation and other debts related to his employment." The court also found that Flanagan owed Wharton for debts he paid on behalf of Flanagan after his employment. The court further concluded that Flanagan agreed to pay Wharton all reasonable fees and costs if Wharton prevailed in any action to recover on the promissory note and also was "liable for [Wharton's] fees and costs as a result of their discovery and litigation conduct." The state court entered a judgment against Flanagan in the total amount of $245,882.39, plus post-judgment interest of eight percent. Through

---

[2] Flanagan executed a promissory note for this loan, in the amount of $2,674.16 (Ex. 43).

collection efforts, Wharton obtained approximately $51,000, approximately half of which went towards accrued interest on the judgment. Flanagan and his wife filed for Chapter 7 bankruptcy on July 13, 2012. They listed the amount owing to Wharton on Schedule F as $228,989.18.[3] Wharton filed proof of claim #11 in the amount of $235,666.04.

Shortly after Wharton commenced this adversary proceeding, he moved for summary judgment based on the state court judgment. This Court denied summary judgment because the judgment stated it was based on both fraud and breach of contract, and the state court did not make specific, detailed findings of fact regarding any acts of fraud. The state court also did not tie specific liability or damages to a finding of fraud. Because the allegations of breach of contract were sufficient to support the damages awarded, this Court could not determine that the issue of whether or not Flanagan committed fraud was "necessarily adjudicated" by the state court. In the absence of such a determination, this Court could not apply the doctrine of collateral estoppel.[4]

Discovery in this case proceeded. In November 2013, Flanagan filed a motion to compel Wharton to produce his tax returns for 2006 and 2007. Wharton responded, contending that: 1) the motion to compel was untimely, as it was filed after the October 2013 discovery cutoff; 2) Wharton's tax returns were not relevant to whether Flanagan committed fraud in connection with this proceeding; and 3) Wharton had a privacy right to the tax returns under established Colorado law. Wharton asked for attorney fees and costs incurred in responding to the motion to compel. At a hearing on December 17, 2013, the Court denied the motion to compel, ordered Wharton to submit a bill of costs, and gave Flanagan the opportunity to substantiate the motion to compel in writing, with an opportunity for Wharton to respond. Wharton filed a bill of costs which included attorney fees of $2,058. Wharton did not ask for reimbursement of attorney fees incurred in preparing the bill of costs or corresponding with Flanagan about the discovery request. The Court has reviewed the bill of costs and both parties' responses in connection with rendering this opinion.

II. Discussion

    A. Defendant Credibility

At the outset, the Court notes that Flanagan was evasive and not forthcoming throughout his testimony. For instance, he often stated he could not recall important events, such as the July 25, 2006 meeting with Wharton (a meeting that Wharton testified lasted for over two hours). The following exchange, which occurred between Wharton's counsel and Flanagan, is typical.

---

[3] Flanagan did not check the boxes to indicate that the debt was contingent, unliquidated, or disputed.

[4] Wharton appealed this order, but the appeal was dismissed as untimely and interlocutory.

Counsel: So you effectively got Mr. Wharton out of the way after that July 25th meeting to move forward with the Zelenovic transaction, correct?
Flanagan: No.
Counsel: He was out of the picture from the company after that July 25th, 2006 meeting, correct?
Flanagan: By his own accord or by my accord?
Counsel: Okay. I'll ask you another question. You didn't do what you said you were going to do at the July 25th meeting, did you?
Flanagan: I don't recall what I said I'd do at the meeting.
Counsel: You didn't repay Mr. Wharton all the amounts he was owed after you received the $400,000[5] from the Zelenovic transaction, did you?
Flanagan: He was repaid the amounts that we thought we owed him for the expenses.
Counsel: We've heard your testimony from the 2010 deposition saying amounts were still owed so --
Flanagan: $6,000 apparently was not --
Counsel: So I'll ask you again.
Flanagan: I --
Counsel: Please let me finish the question then I'll let you finish the answer without interrupting you. You didn't repay Mr. Wharton all the amounts he was owed after you received the $400,000 from Mr. Zelenovic, did you?
Flanagan: Apparently not.
Counsel: Nor did you remove Mr. Wharton from the Compass Bank line of credit or the American Express account, did you?
Flanagan: I don't know that that was my responsibility.
Counsel: But you didn't do it, did you?
Flanagan: I don't know.
Counsel: Do you have any memory of doing that?
Flanagan: I don't have any memory of that.
Counsel: When you told Mr. Wharton at the July 25th meeting you would repay him, you never actually intended to repay him, did you?
Flanagan: That is incorrect.
Counsel: Can you turn to Exhibit 44? I guess you're probably still there.
Flanagan: Yeah.
Counsel: So you testified that Mr. Wharton is extremely detail oriented a few minutes ago, right?
Flanagan: Yes.
Counsel: And this is a very detailed email reiterating the points you and he discussed and agreed to in your meeting the previous day?
Flanagan: From his recollection, yes.

---

[5] The total amount paid to Flanagan from the Zelenovic transaction was $500,000. $400,000 was paid in September 2006, and $100,000 was paid in early 2007.

>Counsel: It states your agreement that Red Robot would repay Mr. Wharton's deferred payroll of $96,000 no later than December 2006. Do you see that?
>Flanagan: He states that, yes. I do not.
>Counsel: And the email also addresses Mr. Wharton's loans to the company stating on the second page in the fourth paragraph that upon receipt of funds from Tom Zelenovic, Mr. Wharton will be paid whatever the outstanding balance ends up being. Do you see that?
>Flanagan: Yes.
>Counsel: And then the next paragraph, the email addresses your personal debt to Mr. Wharton? You see that?
>Flanagan: Yeah.
>Counsel: Now, this is an email from Mr. Wharton to you but you never responded to that email and contradicted Mr. Wharton and telling him that's not what we agreed, did you?
>Flanagan: I don't recall.

At trial, Flanagan frequently gave testimony that contradicted his deposition testimony. In fact, in closing argument, Wharton's counsel pointed to 18 instances where Flanagan's trial and deposition testimony differed. The Court concludes that Flanagan was not a credible witness. Due to Flanagan's lack of credibility, the Court finds that when other evidence contradicts Flanagan's testimony, and Flanagan's credibility on a particular point is put at issue, the Court will give credence to the contradictory evidence absent other factors causing the Court to question it.

In contrast, the Court found Wharton's testimony to be credible. Wharton was direct and to the point; was responsive to the questions, and was not contradicted by documentary evidence or by prior testimony. From the very beginning of his relationship with Flanagan, Wharton took good contemporaneous notes and kept correspondence between the parties, resulting in over 80 exhibits that corroborated Wharton's testimony. While Flanagan did submit some documentary evidence (a total of 18 exhibits), much of it was incomplete, and in any event his evidence did not contradict Wharton's evidence.

>### B. Nondischargeability under 11 U.S.C. § 523(a)(2)(A) on Account of Fraud

>A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt–
>    . . .
>        (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by–
>            (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . ..

11 U.S.C. § 523(a)(2)(A). The elements that Wharton must prove, by a preponderance of the evidence, in order for the Court to hold that Flanagan's debt is nondischargeable under § 523(a)(2)(A) on account of a false representation are:

      1.      that Flanagan made a false representation;
      2.      that Flanagan made the false representation with the intent to deceive Wharton;
      3.      that Wharton relied on Flanagan's false representation;
      4.      that Wharton's reliance was justifiable; and
      5.      that Flanagan's false representation caused Wharton to sustain a loss.

*In re Riebesell*, 586 F.3d 782, 789 (10th Cir. 2009).

    *1) Flanagan Made a False Representation*

    As a general matter, statements concerning future events are not as often found to be a basis for a finding of a misrepresentation as are statements that misrepresent a present fact. In the normal course of events, the failure to perform a future obligation as promised is a mere breach of contract. However, when a promise of future performance is made by one who has no present intention of performing the promise, it is a misrepresentation that may be found to be fraudulent. RESTATEMENT (SECOND) OF TORTS § 530 (1977). *See also In re Kukuk*, 225 B.R. 778, 785-86 (B.A.P. 10th Cir. 1998).

    The Court finds that Flanagan made multiple false representations to Wharton. In order to induce Wharton to merge his company into Red Robot, and later to induce Wharton to defer his compensation, Flanagan promised Wharton he was entitled to an equity interest in Red Robot. This finding is amply supported by Wharton's testimony as well as the documentary evidence. Wharton presented a powerpoint presentation prepared by Flanagan on April 8, 2004, which clearly stated that Flanagan would issue stock to Wharton. (Ex. 3). Additionally, an email from Flanagan to Wharton on February 11, 2005, read: "Are the best. You deserve more money and stock ASAP. Think about how we get this done. Officially. Legally. Etc." (Ex. 19). In another email to Wharton sent on December 3, 2005, Flanagan advised : "As we re-organize the company you have the perfect opportunity to officially get your equity. So don't sweat it." (Ex. 20).

    Then, in July of 2006, Flanagan convinced Wharton to give up his claim to that equity interest[6] and separate from the company in exchange for payment of deferred compensation and repayment of loans. This is also supported by the evidence. While Flanagan testified he could not recall that meeting, Wharton prepared a three-page email to Flanagan the day after the meeting that summarized their discussion. (Ex. 44). In the email, Wharton stated, "we agreed Red Robot will pay out my deferred payroll. At the end of this month, I will have deferred $96,000 in payroll and you will have deferred $67,500." The email also detailed repayment of the $96,000 by December 31, 2006. Wharton further noted that Flanagan had agreed to repay

---

    [6] Flanagan makes much of the fact that, as no equity interest was ever given, there was no equity interest for Wharton to "give up." At trial and in closing argument, however, Wharton successfully showed that what he gave up was any *claim* to the equity that had been promised to him by Flanagan, and the evidence showed that Flanagan clearly had promised that equity.

$10,209.43 in loans Wharton had made to Red Robot, $997 for Wharton's health insurance premium and cell phone, as well as the personal loan to Flanagan for $2,674.16.

At trial, Flanagan admitted he never responded to that email (other than with a brief email noting that he had been at the hospital and would respond to it "when his mind was right."). He also admitted he did not refute the terms of the email, either verbally or in writing, until October 2006, when for the first time, he questioned the amount of deferred compensation he owed to Wharton.

*2) Flanagan Intended to Deceive Wharton*

The Court does not infer Flanagan's lack of intention to pay Wharton as promised from the mere fact that he failed to perform his promise. *See Justheim Petroleum Company v. Hammond*, 227 F.2d 629, 637 (10th Cir. 1955) ("A lawful inference of . . . deceitful intent may be drawn only from established facts."). The Court must, instead, infer Flanagan's intent from the surrounding facts and circumstances. *In re Young*, 91 F.3d 1367, 1375 (10th Cir. 1996) ("[T]he debtor's intent to deceive the creditor in making false representations to the creditor, may be inferred from the totality of the circumstances . . ..") (citations and quotation marks omitted).

The Court is persuaded that Flanagan lacked the present intent to honor his promises made to Wharton, both in April 2004 and July 2006, for several reasons. As noted above, Flanagan initially made several promises to Wharton about his intent to give Wharton equity in the company. However, the evidence presented convinced the Court that Flanagan never intended to make good on those promises. Each time Wharton would make a loan to the company or defer his compensation, Flanagan assured him he deserved an equity interest, but kept coming up with excuses to not make that happen. Continued false excuses support a finding of fraud. *In re Thomas*, No. AP 11-1056 MER, 2013 WL 6840527 (Bankr. D. Colo. Dec. 27, 2013) (concluding that defendant intended to deceive plaintiff where defendant told plaintiff repeatedly that a lien would be paid off and that the check had already been mailed when it in fact had not).

Regarding the July 2006 promises, there are several indications that Flanagan never intended to make good on those either. First, Flanagan never informed Wharton that the Zelenovic transaction had taken place in September 2006. A "lack of transparency and failure to inform [Plaintiff] of the full picture . . . indicates intent to deceive . . ." *In re Gregory*, No. 10-35903 MER, 2013 WL 4516657 (Bankr. D. Colo. Aug. 23, 2013) (finding fraud where the debtor "knew the representations and omissions created a false picture of the transactions"). Second, Flanagan immediately paid himself out of the Zelenovic funds, but not Wharton. *See In re Burton*, 463 B.R. 142 at *4 (BAP 10th Cir. 2010) ("We believe allegations that representations were made to induce someone to invest money, but then were violated only a short time later, are sufficient to suggest the representations were knowingly false when they were made and were made with the intent to deceive the potential investor."). Third, the fact that Flanagan "had the ability to perform his promise" yet did not, further supports a finding of

fraud. *In re Wagner*, 492 B.R. 43 (Bankr. D. Colo 2013).[7] Finally, even months after Flanagan received the Zelenovic funds, he continued making false excuses to Wharton, claiming in January 2007 that he was "still trying to keep this company afloat"—despite the fact that Red Robot had more than $200,000 in its checking account at the time. (Exs. 63, 79.) *See In re Thomas* at *15 (continuing false statements demonstrate intent to deceive).

Flanagan's misrepresentations were not negligent or the result of carelessness. The evidence is clear that Flanagan knew all of the facts relating to his ability to perform his promise upon the transfer of funds from Zelenovic. He knew that, in fact, he would be fully able to pay Wharton just as he had promised. The only thing lacking was his intent to perform the promise. The Court finds that Flanagan made his representations with the intent to deceive Wharton.

### *3) Wharton Relied on Flanagan's Promise*

Wharton testified credibly, and the evidence proved, that Wharton relied on Flanagan's promise of equity when he deferred his compensation and made loans to Red Robot. Further, Wharton gave up his claim to equity in Red Robot, and resigned, in reliance on Flanagan's promises made to him in the July 2006 meeting. By moving aside, Wharton allowed the Zelenovic transaction to move forward without him and placed full control of the company in Flanagan's hands. Rather than fight for his entitlement to share in the upside of the new investment as an equity owner, or contact Zelenovic about the equity interest, he agreed to cut his losses and obtain repayment for the amounts owed to him. Thus, Wharton's actions show that he was relying on Flanagan's promises.

### *4) Wharton's Reliance Was Justifiable*

Under § 523(a)(2)(A), the appropriate standard is not "reasonableness" in the sense of whether an objectively reasonable person would have relied upon the debtor's false representations. Rather, the inquiry is whether the creditor's reliance was "justifiable" from a subjective standpoint. In determining whether a creditor's reliance was justifiable, a court should therefore examine "the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than [applying] a community standard of conduct to all cases." *In re Reibesell*, 586 F.3d at 782.

"The recipient of a fraudulent misrepresentation of intention is justified in relying upon it if the existence of the intention is material and the recipient has reason to believe that it will be carried out." *In re Kukuk*, 225 B.R. at 785. The Court finds Flanagan's representations that Wharton was entitled to an equity interest, and that Wharton would be repaid for loans and

---

[7] The evidence was clear that in October 2006, Flanagan had the ability to pay Wharton the total amount he had promised, rather than the $10,000 "loan amount" he tendered to Wharton at that time. This negates the usual principle that a partial payment can mitigate against a finding of fraudulent intent under some circumstances.

deferred compensation, to be material. The reasonableness of Wharton's reliance on Flanagan's representations is supplied by the relationship between the parties.

In *In re Young*, 208 B.R. 189 (Bankr. S.D. Cal. 1997), *abrogated on other grounds by Cohen v. De La Cruz*, 523 U.S. 213 (1998), the Court analyzed the reliance element, and noted that "even though it may have been unreasonable for the plaintiffs to rely on such a solicitation from a stranger, "[u]nder the circumstances . . . the reliance of [the plaintiffs] upon the munificence of Debtors, people with whom they had close, even family, relationships was reasonable." In this case, both Wharton and Flanagan testified as to the close relationship between them. Flanagan admitted that Wharton was a caring person throughout their relationship, and acknowledged that Wharton had paid Flanagan in February 2006 without paying himself. Wharton testified he did so because Flanagan "needed the money and had small children." Numerous instances appear in the record of Wharton trying to work out the disputes with Flanagan in light of their friendship. (Ex. 44, 62). In the context of their relationship and under these circumstances, the Court finds that Wharton had good reason to rely on Flanagan's stated intentions to provide Wharton equity in the company and to repay Wharton with funds received from Zelenovic.

*5) The Plaintiff's Reliance on Defendant's Misrepresentation Caused Him to Sustain a Loss*

Section 523(a)(2)(A) precludes discharge of "all liability arising from fraud," including any interest or punitive damages tied to an underlying state court judgment. *Cohen v. de la Cruz*, 523 U.S. 213, 214-15 (1998) (finding a judgment, including an award of treble damages, non-dischargeable under 523(a)(2)(A)). The state court judgment awarded damages as follows:

- $144,584.58 for fraud and breach of contract, including pre-judgment interest.
- 3,503.42 under the terms of the Promissory Note, including pre-judgment interest.
- 97,794.30 for attorneys' fees and costs "incurred to date in bringing this action."

The state court based the liability for attorneys' fees on Flanagan's "discovery and litigation conduct, pursuant to C.R.C.P. 37(a) and *Lauren Corp. v. Century Geophysical Corp.*, 953 P.2d 200, 204 ( Colo. Ct. App. 1998)."

After reviewing all the evidence, this Court concludes that the state court judgment is supportable in its entirety as nondischargeable under § 523(a)(2)(A) of the Bankruptcy Code. The entire damages amount was a result of fraud, not just breach of contract, since Flanagan never intended to give Wharton the equity interest or to fully repay Wharton as promised. Regarding the attorneys' fees, "[a]s a rule, attorney fees ... generally take on the character of the litigation in which they were incurred, at least absent 'such extraordinary circumstances as might take the matter out of the general rule.'" *In re Poe*, 118 B.R. 809, 811 (B.C., N.D. Okla.1990). When "there is nothing to show that any part of [the] . . . attorney fees was not incurred in the litigation in which [plaintiff] won damages . . . for fraud, [the] attorney fees take on the

character of damages for fraud, and are likewise nondischargeable." *In re Bolzle*, 158 B.R. 853 (Bankr. N.D. Okla.1993).

Therefore, the entire amount of the state court judgment is nondischargeable under § 523(a)(2)(A). As described in Plaintiff's Amended Itemization of Damages, after offsetting the amounts collected from Defendant and third parties since the state court judgment, the total damages amount still owed by Defendant to Plaintiff as of the March 24, 2014 trial date is $237,388.45. *In re Gregory*, No. 10-35903 MER, 2013 WL 4516657, *5 (Bankr. D. Colo. Aug. 23, 2013) (the damages calculation requires determining what was owed, what remains due, and adding interest).

C.  Motion for Sanctions

At a hearing on December 17, 2013, this Court denied Flanagan's motion to compel Wharton to produce his tax returns for 2006 and 2007. The denial of the Motion to Compel raises the issue of whether to award expenses under Fed. R. Civ. P. 37(a)(5)(B), which provides, in relevant part, as follows:

> If the motion is denied, the court . . . must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party or deponent who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees. But the court must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust.

Fed. R. Civ. P. 37(a)(5)(B), incorporated in adversary proceedings by Fed. R. Bankr. P. 7037.

As provided by the Court's Minutes of Proceeding (docket #58), Wharton's counsel filed a bill of costs for $2,058 (docket #60), to which Flanagan filed a response (docket #65), and counsel for Flanagan filed a memorandum and brief on the applicable provisions of Rule 37(a)(5)(B) (docket #61), to which Wharton filed a response (docket # 62). After a thorough review of these pleadings, the Court finds that Flanagan's Motion was not substantially justified. There was no pending discovery request, and even if there had been one, Flanagan did not make the appropriate showing under Colorado law, which protects the confidentiality of tax returns. The Court also finds that there are not other circumstances that would make an award of fees unjust.

In his response to the bill of costs, Flanagan stated he did not object to the amount of time as scheduled (6.1 hours), but believed the billable rate was excessive.  In determining this issue, the Court is guided by *Praseuth v. Rubbermaid, Inc*., 406 F.3d 1245, 1259 (10th Cir.2005) (approving the district court's determination of a reasonable hourly rate by "relying on its knowledge of rates of lawyers with comparable skill and experience" practicing in the applicable community).  Wharton's counsel, who has 13 years of experience, charged a billable rate of $350 per hour, and delegated some of the work to an associate with three years of experience, who

charged a billable rate of $240. The Court is knowledgeable of the rates of lawyers with comparable skill and experience practicing in the local bankruptcy community and believes the billing rates are reasonable. Therefore, the Court will allow the Bill of Costs in the amount of $2,058.

For the foregoing reasons, it is **ORDERED** that the Denver County District Court judgment rendered in favor of Wharton on May 13, 2010 in Case No. 2009-CV-7221 is found to be nondischargeable under § 523(a)(2)(A). It is further **ORDERED** that Flanagan shall pay Wharton $2,058 for attorney fees and costs as a sanction under Fed. R. Civ. P. 37(a)(5)(B), incorporated in adversary proceedings by Fed. R. Bankr. P. 7037.

Dated this 11th day of August, 2014.

**BY THE COURT:**

_____
Howard R. Tallman, Judge
United States Bankruptcy Court